## THE PEOPLE *v.* VEGA.

### APPEAL from the District Court of San Juan.

No. 164.—Decided May 27, 1909.

PENAL LAW—MURDER IN THE FIRST DEGREE—INSUFFICIENCY OF EVIDENCE—VERDICT OF THE JURY.—The verdict of the jury when approved by the trial court, and a judgment is rendered thereon, will not ordinarily be disturbed by an appellate court, unless the evidence should prove to be so weak and unsatisfactory that it must necessarily be inferred therefrom that the jury, in finding their verdict, were influenced by passion, partiality, prejudice, or other improper motive.

ID.—INSTRUCTIONS TO THE JURY ASKED BY DEFENDANT'S COUNSEL—ABSENCE OF OBJECTION.—The trial court having given to the jury all the instructions asked by counsel for the defendant, and no exception having been taken to those given by the court on its own initiative, any error committed on the latter, not excepted to, shall not be held sufficient cause for reversing the judgment, if enough proofs exist to establish the guilt of the defendant.

ID.—DIRECT EVIDENCE—CIRCUMSTANTIAL EVIDENCE.—In cases of circumstantial evidence, facts should be proved which are not only consistent with the guilt of the defendant but inconsistent with any reasonable hypothesis of innocence; and every simple fact from which the deduction of guilt is to be drawn must be proved by evidence which satisfies the minds and consciences of the jury to the same extent that they are required to be satisfied of the fact in issue in cases where the evidence is direct.

ID.—CIRCUMSTANTIAL EVIDENCE—ACCUSATION OF MURDER—VERDICT OF CONVIC-
TION BASED ON CIRCUMSTANTIAL EVIDENCE.—In order to justify a verdict of
conviction for the crime of murder, dependent only on circumstantial evi-
dence, the facts on which such verdict is based must be absolutely incon-
sistent with the innocence of the defendant, and admit of no explanation
other than the reasonable supposition that he is guilty.

ID.—CIRCUMSTANTIAL EVIDENCE—IN CASES OF MURDER—INSTRUCTIONS TO THE
JURY.—In conformity with the foregoing doctrine, where a case of this
nature is submitted to the jury, the latter should be instructed to the effect
that said doctrine froms part of the law applicable to the case, the instruc-
tions, in general terms, on the legal principles relating to a reasonable doubt,
not being sufficient.

The facts are stated in the opinion.

The appellant did not appear.

*Mr. Rossy, fiscal,* for respondent.

MR. JUSTICE MACLEARY delivered the opinion of the court.

In this case an information was presented against the ap-
pellant, Francisco Vega, in the District Court of San Juan, on
November 30, 1906, charging him with the crime of murder
in the first degree. It is alleged that he killed his mistress,
María González, on the night between the 15th and 16th of
September, 1906, in the house in this city on Tetuán Street,
No. 56, known as "Chuchurumbé." In the early morning of
Sunday, September 16, 1906, the body of María González, a
laundress, was found dead, in her room in the house above-
mentioned, covered with wounds and with her throat cut, and
the floor of the room was wet with blood.

There is no direct evidence showing who committed the
crime; but there are circumstances of various kinds which
are claimed to point to the defendant as the guilty agent.
One of the witnesses states that he saw him during the night
or early morning, between the 15th and 16th of September,
near the entry of the house called "Chuchurumbé." Another
witness states that he met him between half past two and three
o'clock in the morning of the said day in an alley near to the
said house. Still another witness states that he met him about
the same time or a little later in Puerta de Tierra on the *carre-
terra.* Other incriminating facts were also shown by wit-

nesses. It appears that he lived with his mother in Puerta de Tierra, and his mother and his sister, and some others of his relatives, testified that he passed that Saturday night in his mother's house, sleeping in the parlor and complaining of being sick with chills and fever. The defense relied on is an alibi. The testimony in regard to the same is conflicting in many particulars as shown by the statement of facts, as presented in the record. There is no assignment of errors, nor brief, nor bill of exceptions, nor anything else showing on what points the appellant relies for a reversal of the judgment. But it does appear that on the conclusion of the evidence introduced by the prosecution in the trial court, the defendant's counsel made a motion for the court to direct the jury to bring in a verdict of acquittal, on account of the insufficiency of the evidence; *which motion was overruled by the court;* and testimony was then introduced by the defense.

The case went to the jury under an elaborate charge delivered by the presiding judge, giving not only the principles of law which he deemed applicable to the case, and as understood by the court, but also various instructions asked by the counsel for the defense.

The jury had the whole case, both the facts and the law, fairly presented before them, and they brought in a verdict of guilty of murder in the second degree. In accordance with this verdict the court, in due time and in regular order, sentenced the accused to confinement in the penitentiary at hard labor for the peiod of his natural life.

From this judgment an appeal was taken by his counsel in proper form, and the record sent here for consideration.

In view of the gravity of the offense charged and the verdict and judgment rendered against the accused, great care has been taken in reviewing the whole record, in order to ascertain, if possible, whether any fundamental error, either of law or of fact, has been committed by the trial court, the benefit of which might be claimed by the appellant. There is no other ground alleged on appeal for a reversal except

that the evidence introduced does not justify the verdict and judgment rendered.

Can we reverse the judgment on this ground? Of course, should there be found in the record a total failure of evidence, or if the same appears to be so weak and unsatisfactory that it must be necessarily inferred therefrom that the jury, in finding their verdict, were influenced by passion, partiality, prejudice or other improper motive, this court would not hesitate to reverse any judgment based on such a verdict. But otherwise the verdict of the jury, when approved by the trial court and a judgment is rendered thereon, will not ordinarily be disturbed by an appellate court.

Let us carefully examine the incriminateing evidence introduced on the trial. No person whatever testified to seeing the murder committed and the evidence against the defendant is wholly circumstantial.

A summary of the incriminating facts, as gleaned from the statement in the record, is as follows:

María Rufo testified (page 18):

Knows María González; that before the incident she had occasion to talk with María González, whom she saw entering her room sobbing, and she said that Francisco Vega was watching her for the purpose of killing her. That she, María González, and Francisco Vega had broken off their connection. That at the time of the murder they had separated. That Francisco Vega was the paramour of María González. Could not say as to how Francisco Vega treated María González when he lived with her. That after the body was removed the house remained open all night, because it had no lock.

On cross examination (pages 19-20):

When witness talked with María González regarding Francisco Vega and his threats, it was some three months before the murder, and then it was when she saw her crying and asked her what was the matter, and she said that Francisco Vega had said he was going to kill her. And she, who is testifying, replied: "Guard your back from him;" that this

conversation took place over *one year* ago, but less than two years.

Inocencio Díaz, sergeant of detectives, testified (page 20):

Twelve days after the crime he came to San Juan, and under orders of the *fiscal,* witness went to the house where the crime was committed, to deliver some clothes and he delivered the clothes there to one Secundino, the paramour of María, to whom he delivered everything; after having delivered the clothes witness saw marks of footsteps, as if some one had walked in blood, the footmarks being visible, and going in that direction, witness saw at the entrance of the door a pile of rubbish and there found a die. As a policeman, witness knows that Francisco Vega is one who plays "topo"; a game with dice.

That he found the die at the entrance of the door in a pile of rubbish; that he saw various marks of blood; and that the rubbish was in one corner of the door in a pile; does not know who made the pile. That the die was entirely clean and had on it no marks of blood.

Julián Díaz testified (pages 22-23):

Has known Francisco Vega for a long time. Recognized the die as belonging to Francisco Vega. Saw it in his hands before the crime; never saw it in any other person's possession. Before the crime they gambled on the wharf. Knew that the mistress of Francisco was called María and that she is in the cemetery. Speaking one day with Francisco about María he, Francisco, declared that he was sick; that a curse had been put upon him, and that he thought it was by her; and that he said that sooner or later he would take a revenge on her, and that she would have to suffer for it. These declarations he made voluntarily, in an ordinary conversation. That he had gambled with Francisco, but had never gambled with Inocencio Díaz, the detective. That he knew the die to belong to Francisco because he had seen it in his hands.

On being questioned by the judge, the witness explained that he knew the die to belong to Francisco Vega because he

had seen it during play in his hands; that it had the pecularity of being composed of sixes and fives; that even when this die was mixed with others he could distinguish it by its having one particular mark—that is to say, that some are larger and some smaller, none being the same size as this one. (See page 24.)

Francisco Andino testified (page 24):

Has known Francisco Vega for a long time. They were brought up together. Knows that Francisco Vega gambles at "topo." Does not recognize the die. Knows that the mistress of Francisco Vega was María. Remembers one day at 12.30 when going to work, María asked him if Francisco Vega was working, and he answered that he did not know. One day he told Francisco Vega that María had asked him if Francisco Vega was working and Francisco Vega answered: "What reason has this woman to ask after me, when this woman has put a curse on me, and some day I will make her suffer for it?" These manifestations he made when he was sick.

Cecilio Torres testified (page 26):

Lives at No. 56 Tetuán Street. Knows Francisco Vega. Some months before the 15th of September, 1906, saw Francisco Vega—that is to say, three or four months before—in the entrance to the house at about 12.30 at night, at a time when the witness was going to the privy. That when Francisco Vega saw him he leaned against the wall and turned his head, and as he, the witness, knew him, he continued to the privy, and when he returned he had gone. That at the time María did not live with Francisco Vega but with Secundino.

Bautista Díaz testified (page 28):

Remembers that on September 15, 1906, he being at the corner of Tetuán and Gambaro Streets, between 2.30 and 3 o'clock in the morning, he saw Francisco Vega, it being Saturday. That from where he saw Francisco Vega the house of the "Chuchurumbé" was two houses away. That on the night when he saw Francisco Vega the crime occurred which

he know of a short time after seeing Francisco Vega. (Page 29.) That the house of the "Chuchurumbé" is on Gambaro Alley; that he went down Gambaro Alley alone, between 2 and 3 o'clock in the morning; that he saw Francisco Vega standing in the door of the hallway of the house "Chuchurumbé"; that he heard cries, but, as he was not a policeman, he did not busy himself with them; that the cries were for help; he went his way and in an hour or an hour and a half the people began to run, and then he thought that a crime had been committed, and he also went. That when he heard the cries for help he did not see Francisco Vega, because he had gone up the alley toward Sol Street, where there was a dance; he saw that the people were running and he continued on toward his house. That Francisco Vega was walking tranquilly; that he did not answer the cries, as he was not a policeman, although he heard them; that he is neither the friend nor the enemy of Francisco Vega, but that he knows him.

Rafael Mauleón testified (page 29):

Drives the city ambulance, but as a woman was dead he went to Puerta de Tierra for the hearse, and when going from the house after the hearse there he met Francisco Vega, who was dressed in ash colored pants and wrapped in a big coat as though to conceal himself; that he saw and could recognize him by the light of the ambulance; that there was also a street light. That he had known Francisco Vega for a long time, and that where he met him was in Puerto de Tierra, where there are two columns.

Carlos Miró testified (page 30):

Lives in the house where the murder was committed. Heard cries for help and looking out of his window saw a man running. That he has not seen him again. That he lay down again. That when he saw the man he saw his back and could not recognize him; remembers that he was a small man, without a hat and in his shirt sleeves and that he was a mulatto; when he saw him running it seems he was going down the alley of Gambaro apparently toward Puerta de Tierra;

that he was without a hat.  Does not know if he was white or black.  Knows he was a mulatto from his hands.  This was at 2 or 2.30 o'clock a. m.

Barlota de la Cruz, the witness who says she was the concubine of the defendant when the crime was committed, testified that he was sick at the time, suffering from chills and fever and rheumatism, and had been for several days previously, and that, on that account, on the Saturday night when the woman was killed, he had slept in the house of his mother and not in the house of the witness; but that he was in the house of witness between nine and ten o'clock Sunday morning and took a bath there.

There was no evidence whatever connecting the defendant with the hatchet found in the victim's room on Sunday morning after the murder had been discovered.  Defendant attempted to prove an alibi, but did not account for himself between the time when he retired at 10 o'clock the night of the murder and sunrise the next morning; though no one heard him leave his room.

Let us examine the principles of law applicable to the case, and begin with the instructions given by the court to the jury on the trial, and on which, of course, the verdict was based.

''(1) That they must render a verdict in accordance with the evidence introduced, and that it is the duty of the *fiscal* to prove each and everyone of the allegations of the information.  (2) That the accused is legally presumed to be innocent.  (3) That the guilt of the accused must be proven beyond all reasonable doubt.  (4) That if the jury thought that some of the evidence introduced by the *fiscal* was obtained by deceit, coercion or intimidation, such evidence must be considered in favor of the accused and he should be discharged.  (5) That if any of the jurors, after having considered or examined the case, should entertain any reasonable doubt about the guilt of the accused, it is his duty not to vote in favor of rendering a verdict of guilty, nor should his mind be influenced to vote in favor of a verdict of guilty by the fact that the majority of the jury might be in favor of such a verdict.  (6) That in order to find him guilty on circumstantial evidence only, the circumstances must be such as to cause

almost the same degree of certainty as might be caused by direct evidence to the exclusion of all reasonable probability of innocence. That the circumstances must be of such a nature as not to leave in the mind of the jury the slightest presumption as to the innocence of the accused; but they must produce on their minds the absolute certainly of the guilt of the accused.

The court then charged the jury fully giving the statutory definition of murder and explaining the difference between murder in the first and murder in the second degree; and leaving it to them, in case they found the defendant guilty, to fix the degree. The court also read to the jury section 206 of the Penal Code as to the proof necessary to a conviction of murder and explained its meaning. The judge continued as follows:

"So that, gentlemen of the jury, the legislator divides the introduction of the evidence in cases like the present into two parts; one to prove the fact of the death itself, and in order to show what was the cause of that death, how an accused, a person, committed the crime. As to the first, direct evidence is required, no other kind of evidence is admitted; as to the second, any other evidence can be introduced which is sufficient to bring forth a verdict of guilty. Has this been done in the present case? The *fiscal* in order to prove the fact of the death of the person who, it is alleged, was killed, brought two declarations, that of Dr. Vélez and that of Carmen Gelpí; you will see if, by means of those two declarations that they personally saw the corpse, you can arrive at the conclusion that that person referred to in the information actually died. This is the first fact that must be proven on examining the evidence. You must decide that point.

"The fact of the death having been proven, let us see the circumstances surrounding it, how the death was caused, what did the accused do. Has it been shown that it was the accused who caused it? Has it been shown that it was not the accused? This is then what the jury must decide; the more so as in this case the *fiscal* alleges in his information that it was he who caused it, and counsel for the defense alleges that he is not guilty. In order to prove his charge, the *fiscal* has introduced circumstantial evidence only, and it is my duty to inform the jury that this kind of evidence is admitted at law; as a rule there are not ocular witnesses of the great crimes, be-

cause, in fact, great crimes are committed in the dark, and in order
to find the culprit it is necessary to accept the proof resulting from
circumstantial evidence, it is necessary to look for circumstantial evi-
dence; but when I say that it is evidence accepted by the law I do
not mean to say that you must arrive at a verdict of guilty by any
circumstantial evidence that might be brought. This evidence is legal
evidence, but this evidence must be examined coolly as any other evi-
dence and be examined with an honest mind, and see if it is sufficient
in order to arrive at a verdict of guilty.

"If it is sufficient it is good; if it is not sufficient it is not accepta-
ble, as would not be in such a case any other evidence that might be in-
troduced. Therefore, gentlemen of the jury, see if, considering the
evidence introduced by the *fisacl,* if considering all the statements of
the witnesses introduced by the *fiscal,* and gathering them all, there
are sufficient elements to come to the conclusion that the accused be-
fore us in the night stated in the information and in the way stated,
deliberately, with malice aforethought and treacherously killed the
person referred to in the information.

"If, bearing in mind all the circumstantial evidence introduced
by the *fiscal* as inferred from the statements of the witnesses, if taking
into account that die presented by the *fiscal* as evidence, if taking
into account that weapon that has been exhibited, if bearing in mind
all the statements of the witnesses, you come to the conclusion that
the crime was committed in that way, then you may render a verdict
of guilty of murder in the second degree or of murder in the first
degree, as you may believe it to be. You must examine the evidence
coolly, without prejudice for or against the accused. On examining
the evidence you are the only parties who have to consider it and you
must think with your own minds, with your own conscience. Remem-
ber all that the witnesses have stated here, take note of it all and see
to what conclusion you come; make an impartial examination, putting
aside any prejudice that might exist in your minds. If, from an
examination of the evidence you do not come to the first conclusion
mentioned by the judge, then your duty is to acquit the accused. If
you think that there is no evidence, if you think that the evidence
introduced by the *fiscal* is not sufficient, your duty is to acquit the
accused. If there exists any reasonable and well-founded doubt, and
when I say reasonable and well-founded doubt I mean to express that
it is not the doubt that one wishes to create, a doubt that will spare
us responsibilities, but the doubt that arises in the mind of men who
do not shirk responsibilities nobly incurred; the doubt that presents
itself to honest men, the doubt that prevents us from reaching a con-

clusion, if that doubt arises in your conscience as honest jurors, it is also your duty to acquit the accused. Consider, gentlemen of the jury, the whole case, consider the evidence introduced by the *fiscal,* conisder the evidence introduced by the defense, consisting in this case in what at law is called an alibi—that is to say, to show that the accused was, on the day stated in the information, in another place and could not have been in the place mentioned in the information; and in this respect I want to instruct the jury further. The evidence must be considered in its entirety, the jury must try to reconcile all the evidence, not only from one side but from both sides, in order to come to a verdict based on the whole of the evidence; but if there should be any conflicting evidence, then the jury, who are the sole judges as to the credibility of the witnesses, and of the evidence, must decide what evidence they accept and what evidence they reject.''

This charge is correct as far as it goes, but we must inquire whether or not it goes far enough. Inasmuch as the trial court gave to the jury all the instructions requested by the counsel for the defendant, and no exception was taken to any portion of the charge given to the jury by the court, any defect in the charge, which is in itself, as far as it goes, unobjectionable, would not be considered a reversible error, if supported by sufficient evidence to establish the guilt of the accused. The defects in the charge in the present case are not the principal ground for reversal of the judgment of conviction, but are only an incidental reason taken in connection with the lack of evidence to support the verdict of the jury. There is a distinction between direct and circumstantial evidence arising in the nature of things, and drawn by all the the text-writers on the subject and set forth in many judicial opinions.

The true rule on the subject is stated by Greenleaf, as follows:

''Where a criminal charge is to be proved by circumstantial evidence, the proof ought to be not only consistent with the prisoner's guilt, but inconsistent with every other rational conclusion.'' (1 Greenl. Ev., sec. 34; *People* v. *Shuler,* 28 Cal., 490; *People* v. *Strong,* 30 Cal., 154.)

The Supreme Court of California in commenting on a case of forgery which was based on circumstantial evidence, uses the following language:

"In cases of circumstantial evidence, facts should be proved which are not only consistent with the guilt of the defendant but inconsistent with any reasonable hypothesis of innocence, and every single fact from which the deduction of guilt is to be drawn must be proved by evidence which satisfies the minds and consciences of the jury to the same extent that they are required to be satisfied of the fact in issue in cases where the evidenec is direct." (*People* v. *Dole,* 122 Cal., 495.)

It need not be said that the same principles apply in cases of murder as in those of forgery, and that the words of the California court set out the same rule in regard to the weight which should be given to circumstantial evidence.

There is a case of a conviction of murder on circumstantial evidence which was affirmed by the Supreme Court of California on the following principles:

"A defendant may be convicted of murder upon circumstantial evidence, where the circumstances, taken together, are sufficient to uphold the verdict, and to stamp the defendant as the perpertator of the murder.

"Where a defendant is accused of murder, and independent facts and circumstances are relied upon to identify the accused as the person committing the offense charged, each material fact or circumstance necessary to complete the chain or series of independent facts tending to establish the guilt, must be established to a moral certainty and beyond a reasonable doubt; and, if the jury have a reareasonable doubt upon any single essential fact relied upon to complete the chain of circumstances, they cannot convict the defendant as long as they entertain such doubt." (*People* v. *Smith,* 106 Cal., 73.)

In the year 1879, that eminent jurist, Judge Clark, of the Texas Court of Appeals, in the course of a long and able opin-

ion, with the citation of numerous authorities, announces the law on this subject substantially as follows:

"To justify a conviction of murder upon circumstantial evidence alone, the facts relied on must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt. And, if this be so, a jury called to pass upon a case of that character should be informed of the rule as a part of the law applicable to the case. And an ordinary charge upon the law of reasonable doubt, copied from the statute, cannot convey to their minds a clear conception of this exaction of the law, when a conviction is sought upon circumstantial testimony alone; and without some definite rule for their guidance—a rule which will serve to impress itself on their minds, and cause them to weigh most carefully all the facts, isolated or connected, from which they must reach their conclusion or reasonable inference—they are not unlikely, in many instances, to found their verdict upon strong suspicion, or mere probability, which will not suffice under the law." (*Hunt* v. *State,* 7 Tex. App., 212.)"

We do not think the charge of the court sufficiently instructed the jury in regard to the method of arriving at the truth of the matter submitted to them in a case depending entirely on circumstantial evidence. And this oversight may have misled the jury to a conviction on insufficient evidence. To our minds the circumstances proven on the trial were not sufficient in themselves, nor well enough connected with each other to justify a verdict of conviction. No man should be convicted merely on suspicion. It is possible that the accused may be the guilty agent; but he is entitled to the presumption of innocence which our humane law throws around the humblest person who is arraigned in our courts; and until his guilt is proven by competent evidence beyond a reasonable doubt, he cannot be punished for any crime.

For the reasons stated the judgment of the district court rendered herein on September 28, 1907, sentencing the appellant to life imprisonment, at hard labor, in the penitentiary

of Porto Rico, should be reversed and the cause remanded for a new trial in the court below.

*Reversed.*

Chief Justice Hernández and Justice Figueras concurred.

Mr. Justice Wolf dissented.

Mr. Justice del Toro did not take part in the decision of this case.